**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | **NO.  20-cr-414** |
| | : | |
| MICHAEL PIGFORD | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                              **February 26, 2021**

Criminal justice policy in the United States favors the release of incarcerated persons awaiting trial after we determine release is necessary for preparing a defense or for another compelling reason and so long as we are reasonably assured the pretrial detainee does not pose a flight risk or danger to the community.  We today address a pretrial detainee's request for pretrial release arguing he fears COVID at the Federal Detention Center in Philadelphia given his hypertension and history of smoking, and he does not present a flight risk because of strong ties to Philadelphia. He is awaiting trial in less than ninety days on charges of being a felon in possession of a firearm.

We reviewed his medical records and find no compelling reason for his release based upon a fear of COVID-19 in the Federal Detention Center at this stage.  We also have no evidence his release is necessary to prepare his defense as the Federal Detention Center is affording attorney interviews, and he is not claiming he needs or could arrange personal meetings outside of the prison during this COVID era.  But we are most reluctant to release the pretrial detainee given over a decade of criminal conduct involving violence including with a firearm and after having completed a sentence of incarceration in state court for possessing a firearm.  The pretrial detainee has shown no rehabilitation to date and we can think of no

condition which could ensure the safety of the community and others given his conduct.  We are also mindful the pretrial detainee does not identify a place to live upon release depriving us of the ability to evaluate the security of those persons in his immediate surroundings given his long history of violence and illegal possession of firearms.  While mindful of our preference for release from pretrial detention, we must deny the pretrial detainee's present request for pretrial release.

## I.    Background

Now in his mid-thirties, Philadelphian Michael Pigford has a criminal history extending back many years. Even putting aside judicial delinquency findings as a juvenile for purposes of his present risk of danger to the community,[1] Mr. Pigford has over a decade of criminal conduct as an adult.  At twenty-three, the state court found him guilty of driving under the influence of a controlled substance and sentenced him to six days in custody followed by six months of probation.[2]  At twenty-four, he pled guilty to felony possession of a firearm without a license and misdemeanor retail theft.[3]  The state court sentenced him to eighteen to thirty-six months incarceration, and he served a year of probation on the theft charge.[4]  Also at twenty-four, the police arrested him for involuntary deviant sexual intercourse and violation of the Controlled Substances Act.[5]

Two years ago, the police arrested him for again violating of the Controlled Substances Act.[6]  A year later, the police again arrested him for possessing an instrument of crime, simple assault, aggravated assault, reckless endangerment, terroristic threats, strangulation, unlawful restraint, and criminal mischief.[7]  A month later, the police arrested him for assault and reckless endangerment.[8]

### *Mr. Pigford's March 2020 charged conduct.*

His history informs our decision today concerning release but we are also aware of the seriousness of the present charge arising from Mr. Pigford's alleged conduct as a thirty-three-year-old man. On March 27, 2020, Philadelphia police officers received an anonymous complaint about three men selling drugs on a corner where a shooting occurred the previous day.[9]   Officers Joshua Durkin and Joseph Okeyere separately responded to the complaint.[10] Officer Okyere arrived and saw Mr. Pigford standing on the street next to a parked car and speaking to the woman inside the car.[11]   Officer Okyere double parked his car and began walking toward Mr. Pigford.[12]   Mr. Pigford began running away and Officer Okyere chased after him.[13]   Officer Durkin arrived, and seeing this, started following in his car.[14]   During the chase, Officer Okyere saw Mr. Pigford reach into his waistband with his right hand and pull out a gun.[15]   Mr. Pigford ran into an abandoned lot, tripped and fell, and threw the gun as he landed on the ground.[16]   Officer Okyere retrieved the gun a few feet away from Mr. Pigford, and Officer Durkin placed Mr. Pigford in custody.[17]

Mr. Pigford remained in custody in the Philadelphia county jail until the Honorable Crystal Bryant-Powell modified his bail and placed him on home confinement.[18]   Mr. Pigford violated his release conditions by abusing Percocet.[19]   The United States adopted Mr. Pigford's case, and federal agents arrested him on November 5, 2020.[20]   The Honorable Henry S. Perkin granted the United States' motion for pretrial detention on December 4, 2020 following a detention hearing.[21]

### *COVID-19 affecting inmates and staff members at the Detention Center.*

COVID-19 is a respiratory disease spreading mainly through droplets produced when an infectious person, even one who is asymptomatic, talks, coughs, or sneezes.[22] The virus can also

be spread through the air.[23] The practice of social distancing – or staying six feet away from others – can reduce the spread of the virus.[24]

COVID-19 poses a serious global public health risk. As of February 25, 2021 the Centers for Disease Control and Prevention reported a total of 28,065,327 cases of COVID-19 in the United States with 501,181 total deaths caused by the virus.[25] People of any age with the following conditions *are* at increased risk of severe illness from COVID-19: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 kg/m2 or higher); serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; pregnancy; a history of smoking; and Type 2 diabetes mellitus.[26] People of any age with the following conditions *might* be at an increased risk for severe illness from COVID-19: asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pulmonary fibrosis (having damaged or scarred lung tissues); a body mass index greater than 25 kg/m2; pulmonary fibrosis; Thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.[27]

Mindful correctional facilities face unique challenges in controlling the transmission of COVID-19, the Centers for Disease Control issued guidance to prisons and correctional facilities to help them prevent the spread of COVID-19.[28] Following this guidance, the Bureau of Prisons adopted aggressive safety measures, assuring "maintaining safety and security of [its] institutions is [its] highest priority."[29] We are aware the Detention Center adopted a variety of safety

4

measures including suspending social visitation, limiting inmate movement, screening all persons who enter the facility, testing and quarantining all new commitments to the facility and modifying operations within the housing center.

While these measures may have initially slowed the spread of the virus, the Detention Center unfortunately suffered an outbreak in Fall 2020, resulting in over ten percent of its inmates becoming infected at once. We understand the Detention Center has since attempted to contain the virus, and our most recent report states one inmate and four staff members are currently COVID-19 positive.[30] Since it began testing, the Detention Center has reported 390 positive COVID-19 cases.[31]  Thirteen inmates and 131 staff members have been fully inoculated against the virus.[32]   We also understand many incarcerated persons may have declined vaccinations.

The Detention Center's safety measures, which include lockdowns, visitor limitations, and restrictions on inmate movements, have at times come at the cost of defendants' ability to access their counsel and aid in their own defense.  But for the time being, the Detention Center resumed in-person attorney visitation in a room where both social distancing and privacy is maintained.

### *Mr. Pigford's health.*

Thirty-three-year-old Mr. Pigford has hypertension and a ten-year history of smoking, but otherwise enjoys good health. He told our Pretrial Services Office of being in "excellent physical health with no medical problems."[33]  He receives treatment for his hypertension at the Detention Center.  Mr. Pigford has not told us whether he is vaccinated.

*Mr. Pigford's largely undisclosed release plan.*

Mr. Pigford does not state where he plans to reside if granted pretrial release.  He is a lifelong resident of Philadelphia and has family, including a pregnant fiancé, in Philadelphia.[34] While he offered to "provide a home plan with a verifiable address in the next coming weeks,"[35] he has not done so.  He agrees to submit to electronic monitoring and random urinalysis treatment, participate in drug treatment if recommended by Pretrial Services, limit his travel to confines set by Pretrial Services, and report to Pretrial Services as directed.  He further agrees not to possess firearms or ammunition and not to commit any crimes.

## II.    Analysis

Mr. Pigford moves for pretrial release under the Bail Reform Act, 18 U.S.C. § 3142(i), allowing us to reexamine detention pending trial "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."[36] Congress, through the Bail Reform Act, "mandates the release of individuals so long as the court can be reasonably assured the defendant does not pose a flight risk or danger to the community."[37] If "conditions, or a combination of conditions, can be fashioned to reasonably provided such assurances, the individual must be released."[38] Detention is "the carefully limited exception."[39]

Although thirty-three-year-old Mr. Pigford reported "excellent physical health with no medical problems" during his pretrial services interview, Mr. Pigford now argues his health presents a compelling reason for his release.  Mr. Pigford argues his hypertension and ten-year history of smoking present an increased risk of severe illness from COVID-19.  He further argues he is not a flight risk because he has strong ties to Philadelphia and will agree to be

subject to various court-ordered conditions if released.  He also argues the safety measures implemented at the Detention Center have hindered his ability to aid in his defense.

The United States attempts to minimize the risk Mr. Pigford faces by highlighting Mr. Pigford's age and general good health, outlining the measures the Detention Center has taken to mitigate the spread of the virus, and downplaying the seriousness of Mr. Pigford's health risks. The United States argues Mr. Pigford presents a danger to the community and no condition or combination of conditions could reasonably assure the safety of the community or the defendant's presence in court.  The United States further disputes Mr. Pigford's claims the safety measures at the Detention Center prevent Mr. Pigford from participating in his defense.

We must first evaluate whether Mr. Bolger's health conditions present a compelling reason for his release within the context of the COVID-19 pandemic. If we find Mr. Pigford's health conditions constitute a compelling reason for his release, we must then apply the factors Congress identified in section 3142(g) to determine if we can construct conditions of release to reasonably assure the appearance of Mr. Pigford at trial and the safety of any other person and the community.

We find Mr. Pigford does not present a compelling reason for his release and the risk he poses to the community outweighs our preference for pretrial release.

A.    **Mr. Pigford does not present a compelling reason for his release.**

Mr. Pigford does not present an extraordinary and compelling reason justifying his release.  Our Court of Appeals instructs "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify . . . release."[40] Courts evaluating motions for release under Section 3142(i) in this ongoing COVID-19 era typically evaluate four factors: the specificity of the petitioner's stated COVID-19

concerns; the original grounds for the petitioner's pretrial detention; the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the petitioner; and the likelihood that the petitioner's proposed release would increase COVID-19 risks to others.[41]  Weighing these factors, we find Mr. Pigford does not present a compelling reason for his release.

The first factor, which requires us to assess the specificity of Mr. Pigford's COVID-19 concerns, is neutral. On the one hand, Mr. Pigford has a ten-year history of smoking and hypertension. The Centers for Disease Control reports adults of any age with a history of smoking are at an increased risk of severe illness. The CDC further reports having hypertension may increase risk of severe illness.  On the other hand, Mr. Pigford is young, otherwise healthy, and receiving regular treatment at the Detention Center for his hypertension.  While the Detention Center has historically struggled to control the spread of COVID-19 in its facility, it has recently had success in reducing its numbers.  The Detention Center reports only one active case among the 862 total inmates housed in its facilities.  While we do not minimize the risk Mr. Pigford may face due to his health conditions, the low infection rate at the Detention Center and his overall good health, regular treatment, and young age mitigate this risk.

The second factor, which requires us to assess the original basis for Mr. Pigford's detention, weighs against Mr. Pigford.  Judge Perkin ordered Mr. Pigford detained pending trial, finding no combination of circumstances could ensure the safety of the community or Mr. Pigford's appearance at trial.  The Pretrial Services Report prepared for his detention hearing noted Mr. Pigford presented both a danger to the community and a risk of non-appearance.  Mr. Pigford does not allege changed circumstances since Judge Perkin issued his ruling or Pretrial Services prepared their report.

The third factor, which asks us to consider the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the petitioner, weighs against Mr. Pigford. Mr. Pigford's proposed plan is to be released to home confinement, which, in theory could enable him to protect himself against the virus. But Mr. Pigford fails to provide details of his home plan. He does not tell us where or with whom he will be living. Nor does he tell us if he plans to resume employment. Given the prevalence of COVID-19, we cannot say with confidence Mr. Pigford will be safer at an unknown location of unknown size with unknown persons of unknown levels of COVID-19 exposure.

The fourth factor, which requires us to consider the likelihood the petitioner's proposed release would increase COVID-19 risks to others, weighs against Mr. Pigford for the same reason. We cannot assess the extent to which Mr. Pigford presents a risk of spreading COVID-19 to others without the details of his home plan. In advocating for his release, Mr. Pigford notes he has a pregnant fiancé. The Centers for Disease Control include pregnancy among the conditions placing a person at increased risk of severe illness from COVID-19. While we understand Mr. Pigford's desire to be with his fiancé during her pregnancy, releasing him to be with her could pose a risk to her health.

Having weighed these factors, we find Mr. Pigford does not present an extraordinary or compelling reason for release from pretrial detention.

**B.      Mr. Pigford presents a danger to the community upon release.**

Even if Mr. Pigford presented an extraordinary and compelling reason for release, we would not release him because he presents a danger to the community. We weigh Mr. Pigford's proffered compelling reason against the factors we consider when ordering release or detention of a defendant pending trial under section 3142(g). Those factors include the nature and

circumstances of the offense charged, including whether it involves controlled substances or firearms; the weight of the evidence against the defendant; the defendant's history and characteristics (including the person's character, physical and mental condition, family ties, criminal history, and record of appearing at court proceedings); whether the person was on probation, parole, or other court supervision at the time of the alleged offense; and the nature and seriousness of the danger to any person or the community posed by the defendant's release.[42] The United States has the burden of persuasion to show Mr. Pigford presents a danger to the community by clear and convincing evidence.[43] We find, as Judge Perkin did, evaluation of these factors demonstrates Mr. Pigford poses a danger to the community, outweighing the severity of his chronic illness amidst the COVID-19 pandemic.[44]

       The first two factors, which require us to consider the nature of Mr. Pigford's crime and the weight of evidence against him, weigh heavily in favor of continued detention.  Police arrested Mr. Pigford for a crime involving a firearm, which he discarded while fleeing the police. The United States adduced competent and potentially compelling evidence Mr. Pigford knowingly possessed a firearm as a felon, including the eyewitness accounts of two Philadelphia police officers who watched Mr. Pigford toss the gun they found a few feet from where they arrested him, a recorded phone call on which Mr. Pigford admitted to possessing the firearm, and record of Mr. Pigford pleading guilty to felony possession of a firearm without a license in 2013.

       The third factor requiring us to consider Mr. Pigford's history and characteristics, also weighs in favor of continued detention.  Mr. Pigford has a criminal history extending over ten years (as an adult), which includes firearms crimes and crimes of violence.  He also has a long history of drug abuse and admits to using Percocet when the Commonwealth released him on his original state charges in violation of the terms of his release.  Though he alleges he has strong

support in the community and strong ties to Philadelphia, he could not provide an address where he will live on release.

The fourth factor requiring us to ask whether Mr. Pigford was on parole or probation when he committed the charged conduct, weighs in favor of Mr. Pigford because there is no evidence of Mr. Pigford being on parole or probation in March 2020.

Finally, the fifth factor requiring us to ask whether Mr. Pigford is a danger to the community, weighs heavily in favor of continued detention. The police arrested Mr. Pigford in an area where a shooting had occurred the previous day.  While fleeing from police officers, he took a gun out of his waistband and tossed it in a public space.  He previously pled guilty to illegally possessing a firearm and served time in state prison for this offense; a jury may readily find based on the adduced evidence he did not learn his lesson.  Within the past two years alone, the police have arrested him for crimes of violence.  He is a danger to the community at this stage for which we cannot find conditions or circumstances, including home confinement to an unknown address, to favor release.

## III.    Conclusion

After careful consideration, health risks Mr. Pigford may face in custody with hypertension due to COVID-19  are outweighed by demonstrated danger to the community he poses if he is released pending trial. We deny Mr. Pigford's motion for temporary release from pretrial detention without prejudice.

---

[1] Juvenile crimes may be considered in assessing a defendant's danger to the community upon release. In *United States v. Ortiz*, Judge Carlson considered the defendant's criminal record, including juvenile adjudications, in deciding whether he posed a danger to the community. No. 1-19-259, 2020 WL 4570058, at *1 (M.D. Pa. Aug. 7, 2020).  "[J]uvenile and youthful offender records constitute admissible evidence in federal bail proceedings." *United States v. Barnett*, No. 5:03-243, 2003 WL 22143710, at *11 (N.D.N.Y. Sept. 17, 2003). The state court adjudicated Mr. Pigford delinquent for assault and trespassing at thirteen years old and adjudicated Mr.

Pigford delinquent for receiving stolen property at sixteen years old. Pretrial Services Report at 3, 4.   We are aware of these delinquency findings, but they are not material to our finding of risk of danger to the community based on Mr. Pigford's adult criminal conduct for over a decade before the offense charged today.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.* at 5.

[8] *Id.*

[9] ECF Doc. No. 31 at 2.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at 2-3.

[16] *Id.* at 3.

[17] *Id.*

[18] The parties dispute when Mr. Pigford was released.   Mr. Pigford claims the Commonwealth released him on October 15, 2020, and the United States claims the Commonwealth released him on September 15, 2020.   ECF Doc. No. 31 at 5 n.2.

[19] ECF Doc. No. 31 at 5.

[20] *Id.*

[21] ECF Doc. No. 9.

[22] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Social Distancing*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated Nov. 17, 2020).

[23] *Id.*

[24] *Id.*

[25] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19) Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last updated Dec. 9, 2020).

[26] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated Dec. 1, 2020).

[27] *Id.*

[28] United States Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Oct. 21, 2020).

[29] Federal Bureau of Prisons, *Updates to COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last updated Mar. 19, 2020).

[30] Dec. 7, 2020 Letter re: FDC Update, *Brown v. Pistro*, No. 20-1914 (E.D. Pa.) (ECF Doc. No. 155).

[31] Federal Bureau of Prisons, *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus/ (last visited Dec. 9, 2020).

[32] *Id.*

[33] Pretrial Services Report at 2.

[34] *Id.*

[35] ECF Doc. No. 27 at 13.

[36] 18 U.S.C. § 3142(i).

[37] 18 U.S.C. § 3142.

---

[38] *Id.*

[39] *United States v. Salerno*, 481 U.S. 739, 755 (1987).

[40] *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

[41] *United States v. Grimes*, No. 16-59, 2020 WL 3056060, at *6 (E.D. Pa. June 9, 2020).

[42] *Id.,* at *5 (citing 18 U.S.C. § 3142(g)(1)-(4)).

[43] 18 U.S.C. § 3142(f) ("The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence"); *United States v. Perry*, 788 F.2d 100, 114-15 (3d Cir. 1986) (stating, in dicta, "The judicial officer need only be convinced of dangerousness by clear and convincing evidence… the burden of persuasion ultimately rests upon the United States").

[44] ECF Doc. No. 11 at 10-13.