**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 20-414 |
| | : | |
| MICHAEL PIGFORD | : | |

# MEMORANDUM
## WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEARNEY, J.                                                              April 14, 2021

     A Philadelphia police officer walked up to Michael Pigford while he talked to a friend through her car window on a Philadelphia street. Credible testimony from our suppression hearing confirmed the officer did not make a show of authority stepping out of his patrol car and approaching Mr. Pigford.  Mr. Pigford did not submit to authority.  He instead immediately turned and ran up the sidewalk alongside the street displaying a gun in his right hand. The officer pursued him on foot, while an officer in another patrol car followed him in the street. Mr. Pigford turned into an abandoned lot, fell on the ground, and tossed a gun.  The police arrested him for being a felon in possession of a firearm. Mr. Pigford now moves to suppress the gun arguing the police officer seized him in walking up to him while he spoke to his friend. We evaluated the credibility of the officer witnesses and Mr. Pigford's recorded tape recordings describing the same event. We find the officers' consistent testimony to be credible. The officers did not seize Mr. Pigford within the meaning of the Fourth Amendment and appropriately arrested him based upon reasonable suspicion after confirming his possession of a stolen gun as a convicted felon. After evaluating the credibility of witnesses and admitted exhibits, we deny Mr. Pigford's motion to suppress evidence.

## I.       Findings of Fact

1.       The Philadelphia Police learned of and investigated a shooting at the intersection of North 24th Street and West Somerset Street, in the 39th Police District on March 26, 2020.

2.       The 39th Police District, and specifically the corner of North 24th and Somerset, experiences high rates of crime, including gun violence and drug activity.[1]

3.       Philadelphia Police Officer Joseph Okyere, who has served in the 39th District for his entire four-year tenure as a Philadelphia police officer, processed the scene after the shooting.

4.       Philadelphia Police Officer Joshua Durkin, who has served in the 39th District for the full three years of his tenure as a Philadelphia police officer, heard the gunshots.

5.       The Police Department's command debriefed its patrol officers the following day, including Officers Durkin and Okyere, about the shooting and directed the officers to be proactive and warn people to exercise caution in the area following the shooting.

6.       Later the same March 27, 2020, at approximately 5:34 P.M., an unidentified woman called the police to report three men selling drugs at the corner of North 24th Street and West Somerset Street – the same corner as the shooting the night before.

7.       Police Dispatch sent out a radio message to nearby officers patrolling the area, saying, "24th and Somerset . . . . for narcotics . . . 24th and Somerset, three males on the corner."

8.       24th Street in Philadelphia is a two-lane, one-way street, which runs south and connects Cambria Street and West Somerset Street, with Cambria on the north side and Somerset on the south side.  24th Street generally has many cars parked on both sides of the street and did on March 27, 2020.

9. Officers Durkin and Okyere each responded to the radio message. The two fully uniformed officers drove in separate, marked patrol cars. Neither officer turned on their sirens or their red and blue lights to respond to the call shortly after 5:30 P.M. before dusk on the clear day.

10. Officer Durkin drove westbound on Cambria Street and turned left onto 24th Street. He drove southbound on 24th Street past a gold car parked toward the curb on the right side of the street near the northwest corner of 24th Street and Somerset. A woman was sitting in the gold car's driver's seat and a man, later identified as Michael Pigford, stood on 24th Street outside the car on the driver's side talking to her.

11. Officer Durkin continued driving past the gold car and Mr. Pigford. Officer Durkin drove in the left lane (on the east side). He stopped his patrol car right before he reached the intersection, in the cross walk on the northeastern corner of 24th and Somerset, to look around to see if he could see any more men in the area.

12. Officer Okyere also drove south on 24th Street, behind Officer Durkin but in the right lane and saw the gold parked car and the man standing in the street outside the driver's window.

13. Officer Okyere pulled up alongside the left side of the gold car while remaining in the right lane. He parked right behind the standing Mr. Pigford, got out of his vehicle, and began walking around the front of his patrol car toward Mr. Pigford.

14. Officer Okyere did not believe Mr. Pigford to be acting suspiciously at the time and did not suspect Mr. Pigford to be involved in criminal activity. Officer Okyere swore he exited the patrol car to inform Mr. Pigford of the shooting the night before and advise Mr. Pigford to stay clear of the corner of 24th and Somerset for his safety.

15.     Mr. Pigford later described the driver of the stopped gold car as the mother of one of his friend's children.

16.     Officer Okyere swore he did not say a word to Mr. Pigford or his friend as he got out of his patrol car and approached Mr. Pigford.

17.     Mr. Pigford immediately ran when Officer Okyere approached within ten feet.  He ran between the gold car and the patrol car to the back of the two cars, gaining about a ten-foot head start on Officer Okyere, and ran northbound on the eastern sidewalk of 24th Street towards Cambria.

18.     Officer Durkin, still in his patrol car several yards in front of Mr. Pigford and Officer Okyere, looked over his right shoulder, saw Officer Okyere approach Mr. Pigford, and saw Mr. Pigford start running.  He could not hear whether Officer Okyere said anything to Mr. Pigford.[2]

19.     Officer Okyere sent a "flash" over the radio while running, informing nearby officers of his pursuing a suspect on foot on West 24th Street.

20.     Officer Durkin got out of his patrol car and turned to face Mr. Pigford and Officer Okyere to see what was happening.  He then quickly got back in his patrol car, turned on his lights and sirens and made a U-turn on Somerset Street.  He then followed Officer Okyere and Mr. Pigford in his patrol car, driving the wrong way on the one-way 24th Street.

21.     Officer Durkin supplemented Officer Okyere's flash by describing Mr. Pigford's clothing over the radio to nearby officers.

22.     Officer Okyere observed Mr. Pigford reach into his waistband and grab a gun as he ran up the sidewalk on 24th Street.

23.     Officer Okyere drew his service weapon upon seeing the gun and said, "drop the gun!"

24.     Officer Durkin, whose visibility was restricted due to the cars parked on both sides of 24th Street, did not see Mr. Pigford holding a gun and did not hear Officer Okyere yell, "drop the gun!," but he did see Officer Okyere draw his service weapon.

25.     Mr. Pigford continued running up the sidewalk toward the intersection of Cambria Street and 24th Street. Officer Okyere credibly swore Mr. Pigford displayed the gun from his right hand as he ran up the sidewalk on 24th Street.

26.     Mr. Pigford turned around to face south on 24th Street as he run up the street, apparently considering a change of course, but saw Officer Durkin's patrol car now following him up the street; he reconsidered and continued running northbound up 24th Street toward Cambria Street.

27.     Mr. Pigford made a sharp right turn into an abandoned lot at 2853 North 24th Street shortly before reaching Cambria Street.

28.     Officer Okyere chased Mr. Pigford into the lot and saw Mr. Pigford fall.

29.     Officer Durkin had now caught up to Officer Okyere and Mr. Pigford in his patrol car.

30.     Mr. Pigford tossed the gun as he fell in the abandoned lot. Both officers – Officer Okyere from his position in the alley and Officer Durkin from his patrol car – saw Mr. Pigford toss the gun.

31.     Officer Durkin got out of his patrol car and came into the lot. Several more officers had now arrived on the scene.

32.     Officer Okyere secured the loaded black and gold 9mm Smith & Wesson.

33.     Officer Durkin handcuffed Mr. Pigford.

34.     Officer Okyere ran the gun's serial number through police databases, which confirmed the gun had been stolen.

35.     Unidentified officers ran a search for Mr. Pigford on law enforcement databases, discovered he could not lawfully possess a firearm, and placed Mr. Pigford under arrest.

36.     Mr. Pigford is presently awaiting trial set for May 25, 2021 while in custody at the Federal Detention Center in Philadelphia.

37.     Mr. Pigford consented to prison's recording of his telephone calls.

38.     Mr. Pigford called a person named Phil and discussed the events leading up to his arrest.[3]

39.     Mr. Pigford told Phil, "I was talking to Tia [the woman in the gold, parked car]. Cop pull up on me like yeah uh hold up.  Hold up for what? . . . I just came outside.  No, I ain't got no rap, I take off on him."

40.     Mr. Pigford complained to Phil Officer Okyere "was f*cking with [him] . . . for no reason," and opined Officer Okyere did not have "probable cause" to speak with him.  He also said Officer Okyere reported the gun he saw was "black and silver," which is not an accurate description of the black and gold gun.  Eventually, Phil said to Mr. Pigford, "Right, right.  The whole point is you shoulda never had it.  There was no reason, no reason in the world for you to have that gun on you."  Mr. Pigford did not deny he had a gun, but instead explained, "I was putting it up!"

41.     Mr. Pigford also called an unidentified female.  He again described the events leading up to his arrest.  He told the woman, "So I'm talking to my man baby mom and the car he pull up slowly.  He, I see him stop his car, I'm like yo what you want? He like, come here let me talk to you.  I'm like no I got no rap for you all, like what you, why you bothering me you came

here, I'm having a conversation with my friend . . . He, he looked the other way I knew he was about to come I just took off f*ck it I got outta here."

42.     Mr. Pigford also called a second unidentified female.  She asked him why he was in jail.  He told her, "I was on the corner and they just pulled up on me talking about it was three black man selling drugs on the corner but it was only me and some girl.  My man baby mom talking at the car.  They were just so hyped, they liked jumped out on me so I start ran, I ran on them."

## II.     Conclusions of Law

43.     The officers did not seize Mr. Pigford under the Fourth Amendment before he fled from officers.

44.     Neither Officer Okyere nor Officer Durkin made a show of authority before Mr. Pigford fled.

45.     Mr. Pigford did not submit to Officer Okyere or Officer Durkin before he fled.

46.     The officers seized Mr. Pigford only upon apprehending him in the abandoned lot.

47.     Officers Okyere and Durkin had reasonable suspicion to seize Mr. Pigford in the abandoned lot after he fled from officers in a high crime area while holding a gun.

## III.     Analysis

Mr. Pigford moves to suppress the black and gold Smith & Wesson 9mm handgun Officer Okyere recovered near him on March 27, 2020.  Mr. Pigford argues Officer Okyere seized Mr. Pigford within the meaning of the Fourth Amendment without reasonable suspicion or probable cause before he fled from officers.  Mr. Pigford argues evidence discovered after this initial violation upon walking up to him while he spoke to his friend in the gold car is fruit of the poisonous tree and must be suppressed.  The United States argues Officer Okyere did not seize Mr. Pigford before Mr. Pigford fled because Officer Okyere never made a show of authority, and

even if he did, Mr. Pigford did not submit.  The United States argues the police did not seize Mr. Pigford until Officers Durkin and Okyere apprehended him after chasing him into the abandoned lot after he fled from officers and brandished a firearm.

"The initial step of a Fourth Amendment suppression analysis requires us to determine the timing of the seizure."[4] "The timing of the seizure is significant—if the seizure occurred after suspicious behavior such as flight, this factors into our analysis of whether there was reasonable suspicion to justify the seizure."[5]

"Whether an encounter with a police officer constitutes a search and/or seizure under the Fourth Amendment requires consideration of 'all the circumstances surrounding the encounter.'"[6] A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'"[7] "When not accompanied by physical touching, a seizure requires both a show of authority by the law enforcement officer and submission to that authority by the person seized."[8]

To determine whether we must suppress the gun as fruit of the poisonous tree, we must determine whether the officers seized Mr. Pigford before he fled the officers by running up the 24th Street sidewalk.  We first analyze whether the officers made a show of authority.  If the officers made a show of authority, we then assess whether Mr. Pigford submitted to this show of authority. If the officers showed their authority and Mr. Pigford submitted, we must then assess whether the officers had reasonable suspicion to seize Mr. Pigford before he fled.  If the officers did not show their authority or if Mr. Pigford did not submit, we assess whether the officers had reasonable suspicion or probable cause to seize Mr. Pigford after they apprehended him in the abandoned lot. As we find the officers did not show their authority and Mr. Pigford did not submit before he fled, we find the officers did not seize him under the Fourth Amendment until the officers apprehended

him in the abandoned lot.  Once the officers apprehended him in the alley, the officers had reasonable suspicion to seize him based on his headlong flight in a high-crime area and his brandishing a weapon in the officers' presence.

**A.      The police did not seize Mr. Pigford before he fled from officers.**

Mr. Pigford argues the police first seized him under the Fourth Amendment when Officer Okyere approached him because he momentarily froze before running away.  The United States argues the officers did not seize Mr. Pigford before he fled because Officer Okyere did not show his authority and even if he did, Mr. Pigford did not submit.  The United States further argues there is no evidentiary support for the theory Mr. Pigford "froze" at all.  We find no evidence the officers showed their authority, and even they did, the evidence conclusively shows Mr. Pigford did not submit.  The police did not seize Mr. Pigford under the Fourth Amendment before he fled officers.

**1.      Officers Durkin and Okyere did not make a show of authority.**

The police did not seize Mr. Pigford under the Fourth Amendment when he stood beside the gold car before fleeing because neither Officer Durkin nor Officer Okyere then showed their authority.  "The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."[9] We consider several factors in determining whether an officer has made a "show of authority": "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."[10]

Officers Okyere and Durkin did not show their authority before Mr. Pigford fled.  Neither officer physically touched Mr. Pigford or displayed their weapons.  While there were two police

vehicles in the vicinity, only Officer Okyere approached Mr. Pigford.  Officer Durkin drove past Mr. Pigford and did not get out of his patrol car to approach him.  Neither officer turned on their police lights or sirens as they drove down 24th Street approaching Mr. Pigford talking to his friend in the gold car.  We believe Officer Okyere's testimony he did not say anything to Mr. Pigford when he exited his police vehicle. The limited distance between the two men confirm Officer Okyere exited his patrol car and walked towards Mr. Pigford while he spoke to the women in the gold car.  Officer Okyere credibly testified he did not suspect illegal activity.  He had no reason to run at, or challenge, Mr. Pigford.  He had no reason to yell or threaten Mr. Pigford.  As he did not say anything to Mr. Pigford, Officer Okyere's language or tone could not signal to Mr. Pigford a restriction on his ability to walk away.

But even if we did not believe Officer Okyere's testimony he did not say a word to Mr. Pigford, we still would not find a "show of authority" necessary to find seizure.  Mr. Pigford provided three different accounts over time regarding the events outside the gold car. He first recounted Officer Okyere said, "hold up."  He then changed his story to Officer Okyere saying "come here, let me talk to you."  Mr. Pigford then told another friend a third version of multiple officers jumping out of their patrol cars and charging Mr. Pigford.  As there is no evidentiary support for the third account of multiple officers charging Mr. Pigford, we disregard this version. But even if we were to credit Mr. Pigford's unsworn account Officer Okyere told him to "hold up" or said "come here, let me talk to you," we still would not find a show of authority.

Chief Judge Giles's reasoning in *United States v. Dupree* is instructive.  In *United States v. Dupree*, two Philadelphia police officers responded to an anonymous tip about a man with a gun wearing a black shirt and tan pants on the corner of 13th Street and Erie Avenue.[11]  The officers pulled up to the corner and saw a man matching the description in the tip.[12]  The officer driving

the patrol car put his vehicle in park and while getting out he said to the defendant, "hold up, I need to talk to you for a second" in an ordinary conversational tone.[13]  The defendant immediately ran, and the officers pursued him.[14]  When they caught up to him, the defendant put his hands in the air revealing a gun at his waistband.[15]  The defendant moved to suppress the gun, arguing the officers seized him without reasonable suspicion before he fled.[16]

Chief Judge Giles denied the motion, finding the officers did not show their authority, and the defendant did not submit.  He explained, "the officer's actions in stepping towards the Defendant and his use of the phrases 'hold up' and 'I need to talk to you for a second,' especially when spoken in an ordinary and non-aggressive manner, do not rise to the level of a show of authority as a matter of law."[17]  Chief Judge Giles in analyzing the totality of the circumstances found:  "there were only two officers, neither of whom had his weapon drawn"; the defendant's "movement . . . was not blocked in any meaningful sense"; "there was . . . nothing overtly intimidating or aggressive about the officer's conduct"; the officer "used an ordinary tone when speaking with Defendant and never insinuated that Defendant would be compelled to speak with him if he did not wish to do so"; and "Defendant was not told he was about to be arrested."[18]  Chief Judge Giles held, "under the circumstances presented, . . . a reasonable person would have felt he was free to leave."[19]

Even if we believed Mr. Pigford's unsworn account of events and found Officer Okyere said "hold up" or "come here, let me talk to you" or some combination of the two, we find (like Chief Judge Giles) these statements made in an ordinary tone would not, on their own, rise to the level of a show of authority.  Like in *Dupree*, there is no evidence Officer Okyere used a threatening tone, blocked Mr. Pigford's right of passage, displayed his service weapon, told Mr.

Pigford he was about to be arrested, or did anything overtly intimidating when approaching Mr. Pigford. A reasonable person in Mr. Pigford's situation would believe himself free to leave.

> ### 2.   Mr. Pigford did not submit even if Officers Durkin and Okyere had shown their authority.

Mr. Pigford did not submit regardless of whether the officers showed their authority. A seizure does not occur when the subject does not yield to an officer's show of authority.[20] To determine if an individual submitted to a show of authority, we look to both "the nature of the show of authority" and "[the] suspect's conduct at the moment the officer asserted his or her authority."[21] A suspect does not submit to authority when "compliance was extraordinarily brief."[22]  "[M]omentary compliance [is] not enough to trigger a seizure."[23]

Our Court of Appeals has offered guidance several times on what constitutes submission to a show of authority. In *United States v. Valentine*, two uniformed officers in a marked car responding to an anonymous tip approached three men in a parking lot.[24] The three men began walking away from the police immediately.[25] An officer ordered one of the men to come over and place his hands on the car.[26] The man said, "Who me?" and then charged towards one of the officers in an attempt to flee.[27] The officer grabbed the man as he was trying to run and the two struggled. A gun fell from the man during the altercation.[28] The man disputed the officer's story, saying he stopped and "gave his name" before attempting to flee.[29] The Court of Appeals held, even assuming the truth of the man's story, "he did not submit in any realistic sense to the officer's show of authority."[30] The Court of Appeals held the officers did not seize the man until after he tried to flee.

In *United States v. Smith*, a Wilmington Police lieutenant ordered officers to "stop and identify anyone walking in [an area with a recent crime wave] and to just basically make [their] presence known."[31] Two police officers, consistent with this order, followed a man walking down

the street in their patrol car and pulled up next to him.[32]   One of the officers leaned out of the window and asked, "Can I talk to you for a second?"[33]   The man stopped and turned to face the officers.[34]   The officer asked the man if he had identification. The man said he did not.[35]   The officer then asked where the man was heading, and the man replied he was going to "his girl's house."[36]   The officer asked, "where is your girl's house?", but instead of answering, the man kept repeating "I am heading to my girl's house."[37]   The officer repeated his question several times.[38] The officer then asked the man to place his hands on the vehicle so the officers could "speak with him further."[39]   The man took two steps towards the vehicle and the officers opened their car doors.[40]   At this point, the man turned and ran.[41]   The officers chased the man in their patrol vehicle.[42]   The man ran through a parking lot and tried to scale a fence.[43]   The officers got out of the patrol car and began chasing him on foot.[44]   A gun fell from his waistband while the man climbed the fence.[45]   The officers caught up to him, gave him a "stun blow" to the back of the head, and recovered the firearm.[46]   The man moved to suppress the gun. The district court judge suppressed the evidence, finding the officers seized the man without reasonable suspicion by stopping and questioning the man before he fled from officers.[47]   The judge found the officers showed their authority and the man "submitted" by taking two steps towards the vehicle after they asked him to put his hands on the car.[48]

Our Court of Appeals reversed, finding the man had not submitted to a show of authority and thus had not been seized under the Fourth Amendment until the officers apprehended him following the chase.[49]   The court explained "law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places by putting questions to them if they are willing to listen."[50]   It continued, "[e]ven when law enforcement officers have no basis for suspecting a particular

individual, they may pose questions, [and] ask for identification" without running afoul of the Fourth Amendment's prohibitions.[51] Our Court of Appeals held the officers did not "show their authority" simply by asking repeated questions to the man, and only showed their authority when they ordered him to stop and put his hands on the vehicle.[52] The court then held "there is nothing to suggest [the man's] two steps or his non-responsive answers represented manifest compliance with the officer's orders."[53]

Our Court of Appeals in *Smith* also contrasted their earlier opinion in *Johnson v. Campbell*.[54] In *Johnson*, a woman working at a motel called the police on one of her guests – a black high school basketball coach staying in the hotel with the team for a tournament – because she believed he was acting suspicious.[55] When the police officers arrived, the man was sitting in a van marked as a state-owned school district vehicle.[56] The officer gestured to the man to roll down his window.[57] The basketball coach refused.[58] The officer asked a few more times, and the coach rolled down the window a few inches.[59] The officer asked for identification, and the coach refused and asked why they were asking for it.[60] The coach argued with the officers.[61] A second officer approached the car, and the basketball coach muttered "son of a b*tch."[62] The officers then arrested the coach for disorderly conduct.[63] The police released the coach an hour later and did not file charges.[64]

The coach sued the police officers under the civil rights laws alleging they seized him without reasonable suspicion or probable cause. The jury found in favor of the police officers, and our Court of Appeals vacated the verdict, finding "the record critically lacking in evidentiary support for the jury's findings that [the officer] had reasonable, articulable suspicion that [the coach] was engaged in criminal activity when he stopped him, and that [the officer] had probable cause to arrest [the coach] for disorderly conduct when [the coach swore]."[65] In reaching this

conclusion, our Court of Appeals first determined the moment the officers "seized" the coach.  The court held the officers "seized" the coach "a few seconds into the encounter, when it became clear that –[the coach] could not refuse [the officer's] request."[66]  The court explained "[a]lthough [the coach] may have felt free to decline, and did in fact attempt to decline, [the officer's] initial request to roll down the window, the very next moment, when [the officer] persisted rather than accepting [the coach's] choice not to acquiesce, the interaction became a stop."[67]  The court continued, "[a]t that time, [the officer] made it clear that [the coach] was not free to ignore him and would not be left alone until he complied."[68]

Our Court of Appeals in *Smith* distinguished *Johnson* explaining the Wilmington patrol officers in *Smith* made "no overt indication that the questioning was not part of a consensual encounter between the officer and Smith."[69]  It further noted the officers in *Smith* did not make a show of authority and did not tell the defendant he was being detained compared to *Johnson* where the police officer advised the coach at the beginning of the encounter of being detained.[70]

In *United States v. Lowe*, Philadelphia police officers received a radio call at around 4:00 A.M. reporting a black man wearing a grey hoodie with gun in his waistband on a certain corner in a high crime area where a gunshot had also been reported ninety minutes earlier.[71]  The report originated from an anonymous tip.[72]  Three police cars containing at least four officers approached the corner and saw a man matching the description speaking to a woman.[73]  At least one of the cars had its sirens and lights on until it was about a block away from the corner.[74]  The three testifying officers swore to different stories.  One officer testified they approached the man and asked him to remove his hands from his pockets "five to ten times" and the man did not comply, but instead "froze" and looked both ways over his shoulder.[75]  The officer testified he pulled out his service weapon, prompting the man to take his hands out of his pockets and move towards the

wall.[76]   The officers then pushed him up against the wall.[77]   Another officer testified the man voluntarily complied with the officers' commands right away.[78]   A third officer testified the man did not comply with their orders until the officers grabbed him and placed him up against the wall.[79]   A frisk ensued and the officers recovered a firearm.[80]   The entire encounter lasted less than two minutes.[81]

Our Court of Appeals held the gun must be suppressed because the officers seized the man without reasonable suspicion.   The court first determined the officers "showed their authority" because three marked police cars arrived at the man's residence at 4:00 in the morning, three officers approached him, they commanded him to show his hands, they rushed towards him, and one officer drew his weapon.[82]   The court then analyzed whether the man "submitted."   The court explained, "[w]hen a suspect flees after a show of authority, the moment of submission is often quite clear:  It is when the fleeing suspect stops, whether voluntarily or as a result of the application of physical force."[83]   It continued, "[b]ut different factors must be considered when an individual is already stationary, or 'when an individual's submission to a show of governmental authority takes the form of passive acquiescence.'"[84]   It explained, "while 'a fleeing man is not seized until he is physically overpowered, . . . one sitting in a chair may submit to authority by not getting up to run away."[85]   But the court caveated, "in either case, a show of authority without actual submission is not more than an 'attempted seizure.'"[86]   Our Court of Appeals then held the man "submitted to the officers' authority by staying put . . . [n]either his action, in taking a few steps backwards before stopping, nor his inaction, in keeping his hands immobile despite commands to move them, negated that submission."[87]

Mr. Pigford has an even weaker case for submission than the defendants in *Smith* and *Valentine*.  Unlike the defendant in *Valentine*, who said "who, me?" and gave his name to officers,

16

Mr. Pigford did not wait for Officer Okyere to pose a question or issue a command before he took off running. Unlike the defendant in *Smith*, who answered several questions and took two steps towards the police vehicle when asked, Mr. Pigford fled as soon as he saw Officer Okyere approach. Given our Court of Appeals' holding the defendants in *Valentine* and *Smith* did not submit, we find Mr. Pigford did not submit.

Mr. Pigford argues he, like the defendant in *Lowe*, submitted by temporarily freezing before sprinting away from officers. He argues his submission to a show of authority took the form of "passive acquiescence" like the court described in *Lowe*. We are not persuaded based on our evaluation of the credible testimony offered by the officers and Mr. Pigford's varying narratives. Our Court of Appeals in *Lowe* specifically differentiated the stationary man who passively acquiesces to a show of authority from the "fleeing suspect." Mr. Pigford is far more like the hypothetical "fleeing man [who] is not seized until he is physically overpowered" than the hypothetical man "sitting in a chair" who is seized "by not getting up to run away."[88] Further, in *Lowe*, several officers pulled up in front of the defendant's house in the middle of the night with their sirens on, swarmed the defendant, and ordered him to show his hands. At least one officer drew his service weapon. The defendant took two steps back before the officers pinned him against the wall. Mr. Pigford did not slowly back away from a pack of officers who pulled up with sirens blaring in the middle of the night, swarmed him with weapons drawn, and issued commands – he sprinted away from one officer who pulled over in the late afternoon before dusk without turning on his sirens, got out of his car, said nothing, and approached Mr. Pigford.

Mr. Pigford's reliance on *Johnson* is also unavailing. Mr. Pigford did not have a long, drawn out encounter with officers like the coach in *Johnson*, who was asked a number of questions and was ordered several times to roll down his windows and provide identification. Mr. Pigford

17

instead immediately fled upon seeing Officer Okyere exit his vehicle and approach him. While the officers in *Johnson* told the coach they planned to detain him and repeatedly asked him questions after the coach made clear he did not want to talk to them, Officer Okyere said nothing to Mr. Pigford before Mr. Pigford took off up 24th Street.

Mr. Pigford did not submit to the officers' authority and the officers did not seize him under the Fourth Amendment.

### B.    The officers had reasonable suspicion to seize Mr. Pigford after he fled.

Having determined the officers did not seize Mr. Pigford before he fled, we must determine whether the officers had reasonable suspicion to seize him when they apprehended him in the abandoned lot. We find the officers had reasonable suspicion to seize Mr. Pigford after he fled from Officer Okyere in a high crime area while brandishing a firearm. "Headlong flight in a high-crime area provides reasonable suspicion."[89]  Officer Okyere saw Mr. Pigford display around a gun from his right hand as he ran, and both Officer Okyere and Officer Durkin saw Mr. Pigford throw a gun as he fell in the abandoned lot. The officers had probable cause to arrest Mr. Pigford after confirming his status as a felon possessing a gun.

## IV.    Conclusion

We deny Mr. Pigford's motion to suppress the Black and Gold 9mm Smith & Wesson handgun.

---

[1]  The Philadelphia Police Department installed a pole camera at 24th and Somerset due to the high incidence of crime in this area. Neither the United States nor Mr. Pigford attempted to introduce footage from this pole camera.

[2]  The two officers' recollection of the exact location of their patrol cars is inconsistent but immaterial to our findings. Both officers agree Officer Durkin parked his patrol car further south than Officer Okyere and the gold car and in the left lane (east side) of the street. Both officers

further agree the gold car and officer Okyere were near the right/west side of 24th Street almost in the crosswalk before Somerset Street.

Officer Okyere recalls pulling up alongside the gold parked car behind the standing Mr. Pigford. Officer Durkin recalls Officer Okyere pulling up behind the gold parked car.

Officer Durkin recalls he parked about a car's length in front of the parked gold car on the left side northeast corner of the intersection at Somerset and 24th Street. Officer Okyere remembers Officer Durkin having crossed through the intersection, putting him at the southwest corner.

We credit each officer's testimony regarding the location of his patrol car. For Officer Okyere's location, Officer Okyere was in a better position to gauge his own location, and Officer Durkin's attention was divided between observing Officer Okyere and looking for males matching the description in the radio message.

For Officer Durkin's location, Officer Okyere's focus was more so on Mr. Pigford than on Officer Durkin. Officer Durkin testified he saw Mr. Pigford start running over his shoulder and then quickly made a U-turn and started following. Given the fact 24th Street allows parking on both sides, we find Officer Durkin credible as to making a U-turn in the intersection rather than making a U-turn on 24th Street south of Somerset.

[3] Mr. Pigford chose not to testify during the suppression hearing requiring we credit his version of events from these recorded phone calls.

[4] *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008).

[5] *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009).

[6] *Id.*

[7] *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

[8] *United States v. Henderson*, 123 F. App'x 459, 462 (3d Cir. 2005).

[9] *Hodari D.,* 499 U.S. at 628.

[10] *Smith*, 575 F.3d at 313.

[11] *United States v. Dupree*, No. 08–00236, 2008 WL 2522432, at *1 (E.D. Pa. June 24, 2008).

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

19

[16] *Id.*

[17] *Id.* at *2.

[18] *Id.*

[19] *Id.*

[20] *Id.* (citing *Hodari D.,* 499 U.S. at 626).

[21] *United States v. Lowe*, 791 F.3d 424, 430-31 (3d Cir. 2015).

[22] *Id.*

[23] *Smith*, 575 F.3d at 316.

[24] 232 F.3d 350, 353 (3d Cir. 2000).

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 359.

[31] *Smith*, 575 F.3d at 311.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.* at 316.

[50] *Id.* at 312.

[51] *Id.*

[52] *Id.* at 316.

[53] *Id.*

[54] *Id.* at 313 (citing *United States v. Johnson*, 332 F.3d 199 (3d Cir. 2003)).

[55] 332 F.3d at 201.

[56] *Id.* at 203.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id*

[63] *Id.*

[64] *Id.*

[65] *Id.* at 204.

[66] *Id.* at 206.

[67] *Id.*

[68] *Id.*

[69] *Smith*, 575 F.3d 308 at 314 (citing *Johnson*, 332 F.3d at 215).

[70] *Id.* (citing *Johnson*, 332 F.3d at 215).

[71] 791 F.3d 424 (3d Cir. 2015).

[72] *Id.* at 428.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.* at 429.

[81] *Id.*

[82] *Id*. at 432.

[83] *Id.* at 431.

[84] *Id.* (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

[85] *Id.* (citing *Brendlin*, 551 U.S. at 262).

[86] *Id.* (citing *Brendlin*, 551 U.S. at 254).

[87] *Id.* at 234.

[88] *Id.* at 431.

[89] *Valentine*, 232 F.3d at 359.